UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCOTT KEARNS,

    Plaintiff,

v.                                      Case No. 8:19-cv-861-T-AEP

ANDREW M. SAUL,
Commissioner of Social Security,

    Defendant.
                                       /

**ORDER**

Plaintiff seeks judicial review of the denial of his claim for disability insurance benefits ("DIB"). As the Administrative Law Judge's ("ALJ") decision was not based on substantial evidence and failed to employ proper legal standards, the Commissioner's decision is reversed and remanded.

**I.**

**A.    Procedural Background**

Plaintiff filed an application for DIB (Tr. 181-87). The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration (Tr. 75-108). Plaintiff then requested an administrative hearing (Tr. 109-10). Per Plaintiff's request, the ALJ held a hearing at which Plaintiff appeared and testified (Tr. 30-74). Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits (Tr. 15-29). Subsequently, Plaintiff requested review from the Appeals Council, which the Appeals Council denied (Tr. 1-6, 170-77). Plaintiff then timely filed a complaint with this Court (Doc. 1). The case is now ripe for review under 42 U.S.C. § 405(g).

**B.     Factual Background and the ALJ's Decision**

Plaintiff, who was born in 1967, claimed disability beginning October 14, 2015 (Tr. 181). Plaintiff obtained one year of college education (Tr. 206). Plaintiff's past relevant work experience included work as a garbage collection driver, order taker, and furniture delivery driver (Tr. 68-69, 206). Plaintiff alleged disability due to a burst fracture of his L1 vertebrae (Tr. 205).

In rendering the administrative decision, the ALJ concluded that Plaintiff met the insured status requirements through December 31, 2020 and had not engaged in substantial gainful activity since October 14, 2015, the alleged onset date (Tr. 20). After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: history of L1 burst fracture; obesity; and degenerative disc disease and stenosis (lumbar spine) status post bilateral hemilaminectomies and discectomy (Tr. 20). Notwithstanding the noted impairments, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 20). The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform sedentary work, except that Plaintiff required use of an assistive device for ambulation and was limited to work not requiring the climbing of ladders, ropes, or scaffolds; no more than occasional climbing ramps or stairs, crawling, crouching, kneeling, and stooping; no more than frequent balancing; no more than a concentrated exposure to extreme cold and hazards; and no more than a moderate exposure to vibrations (Tr. 21). In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were

2

not entirely consistent with the medical evidence and other evidence (Tr. 22). Considering Plaintiff's noted impairments and the assessment of a vocational expert ("VE"), the ALJ determined Plaintiff could perform his past relevant work as an order taker (Tr. 25). Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 25).

## II.

To be entitled to benefits, a claimant must be disabled, meaning the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The SSA-, in order to regularize the adjudicative process, promulgated the detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must determine, in sequence, the following: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4). If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do

other work in the national economy in view of his or her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 404.1520(g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotation marks omitted)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not re-weigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004) (citation omitted). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

**III.**

Plaintiff argues that the ALJ erred by failing to afford proper weight to the opinions of Dr. Inga, Plaintiff's treating neurosurgeon, arguing that (1) the ALJ applied an overly mechanistic application of the term "disability" to Dr. Inga's opinion that Plaintiff was totally disabled; (2) the ALJ incorrectly considered Plaintiff's rejection of Dr. Inga's recommendation to use surgery to treat Plaintiff's burst fracture; and (3) the ALJ either afforded more weight to or relied more heavily upon an opinion from a non-examining medical consultant than on the opinions of Dr. Inga.[1] In turn, the Commissioner asserts that the ALJ did not err because (1) the ALJ correctly noted that many of Dr. Inga's opinions pertained to the ultimate issue of whether Plaintiff was disabled; (2) the ALJ properly determined that Dr. Inga's opinions were inconsistent with the medical record as a whole; and (3) the ALJ appropriately considered Plaintiff's failure to obtain surgery despite Dr. Inga's assessment that surgery would return Plaintiff to work. For the reasons that follow, the ALJ failed to apply the correct legal standards, and the decision is not supported by substantial evidence.

**A. Medical Opinion**

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what the claimant can still do despite the impairments, and physical or mental

---

[1] Plaintiff's argument regarding the weight afforded to Dr. Gloria Hankins, a state agency medical consultant, is misplaced. In considering the state agency medical consultant's opinion, the ALJ afforded the opinion little weight and did not use that opinion to discount the opinion of Dr. Inga or otherwise afford the opinion greater weight than Dr. Inga's. (Tr. 21-22). Rather, the ALJ afforded little weight to the opinion of Dr. Hankins, who opined that Plaintiff could perform work at the less than light exertional level with additional postural limitations (Tr. 21-22, 88-97). In doing so, the ALJ indicated that, though the RFC was more restrictive than the one offered by Dr. Hankins, the RFC was more consistent with the medical evidence, especially the evidence developed after Dr. Hankins rendered her opinion (Tr. 21-22). Accordingly, Plaintiff's argument on that point lacks merit.

restrictions. 20 C.F.R. § 404.1527(a)(1).[2] When assessing the medical evidence, the ALJ must state with particularity the weight afforded to different medical opinions and the reasons therefor. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (citation omitted). The Social Security regulations provide guidelines for the ALJ to employ when evaluating medical opinion evidence. *See* 20 C.F.R. § 404.1527. In determining the weight to afford a medical opinion, the ALJ considers a variety of factors including but not limited to the examining relationship, the treatment relationship, whether an opinion is well-supported, whether an opinion is consistent with the record as a whole, and the area of the doctor's specialization. 20 C.F.R. § 404.1527(c). For instance, the more a medical source presents evidence to support an opinion, such as medical signs and laboratory findings, the more weight that medical opinion will receive. 20 C.F.R. § 404.1527(c)(3). Further, the more consistent the medical opinion is with the record as a whole, the more weight that opinion will receive. 20 C.F.R. § 404.1527(c)(4).

Typically, the ALJ must afford the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford*, 363 F.3d at 1159 (citation omitted). Good cause exists where: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the physician's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). In fact, the ALJ may reject any opinion when the evidence supports a contrary conclusion. *Sryock v. Heckler*, 764 F.2d 834,

---

[2] This regulation applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. Claims filed on or after March 27, 2017 are governed by a new regulation applying a somewhat modified standard for the handling of opinions from treating physicians. *See* 20 C.F.R. § 404.1520c; *see also Schink v. Comm'r of Soc Sec.*, 935 F.3d 1245, 1259 n.4 (11th Cir. 2019). Since Plaintiff filed his claim on January 22, 2016 (Tr. 181-82), 20 C.F.R. § 404.1527 applies.

835 (11th Cir. 1985) (*per curiam*).  As the Eleventh Circuit recently reiterated, however, an ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician.  *Schink*, 935 F.3d at 1259 (citation omitted).  The failure to do so constitutes reversible error.  *Id.* (citation omitted).

In rendering the decision, the ALJ afforded little weight to the opinions of Dr. Inga, stating:

> I gave little weight to treating source Dr. Jorge J. Inga M.D., who in October of 2015 opined that the claimant was unable to stand or sit for more than a few minutes at a time and was to remain on bed rest at all times.  Dr. Inga also, in January, March, and May of 2016 opined that the claimant was unable to return to work and temporarily totally disabled.  Dr. Inga in January of 2018 opined that the claimant would be off task more than 20% in an 8 hour workday; could stand, sit, or walk for 0 minutes at one time; could sit less than 2 hours I an 8 hour workday; needed his legs elevated 80% of the time he was sitting; could not bend or twist at the waist; and would miss work more than 3 times a month.  Finally, Dr. Inga in February of 2018 opined that the claimant was unable to engage in any form of work, to include sedentary work; that the claimant's improvements in his fracture stopped on February 14, 2017; the medically recommended lumbar surgery would return the claimant to work activity; and that the claimant had a fear of surgery (Exhibits 2F, 5F, 6F, 8F, and 10F).  In regards to disability, the determination of disability is an issue reserved for the Commissioner.  Furthermore, the extreme limitations suggested by Dr. Inga were inconsistent with the medical evidence record as a whole.  Particularly, Dr. Inga's own treatment notes that indicated gradual improvements without any prescribed medications and self-reported strengthening of his trunk and lower extremities through physical therapy (Exhibit 9F).  Finally, Dr. Inga opined that the claimant would be expected to return to work activity with the proposed lumbar surgery.  However, Dr. Inga concluded that the claimant had a fear of surgery.

(Tr. 22).  As the Commissioner contends, statements by a medical source that a claimant is "disabled" or "unable to work" constitute opinions on issues reserved to the Commissioner and do not direct that a finding of disabled is warranted.  20 C.F.R. § 404.1527(d)(1); *see Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877-78 (11th Cir. 2013) (stating that it is the Commissioner, not a claimant's physician, who determines whether a claimant is statutorily disabled, and a statement by a medical source that a claimant is disabled does not mean that the

Commissioner will conclude a claimant is disabled). The ALJ need not afford any special significance to the source of such an opinion because the determination of disability and ability to work remain issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(3). In that regard, the ALJ did not err. To Plaintiff's point, however, the ALJ's overly simplistic and mechanistic consideration of Dr. Inga's consistent and repeated opinions regarding Plaintiff's inability to perform work activities with a fractured spine, especially where no other treating physician appears in the record to offer a contrary opinion, warrants remand.

As noted, Plaintiff alleged disability due to a burst fracture of his L1 vertebrae, which he suffered after falling off of a ladder at home in October 2015 (Tr. 205, 271). Following an MRI confirming the existence of the fracture of the lumbar spine two days later, Dr. Inga instructed Plaintiff to report to the hospital to obtain a CT scan and X-rays and referred Plaintiff to Dr. Berlet (Tr. 271). Dr. Berlet reviewed the MRI results, concluded that Plaintiff suffered a burst fracture in the upper lumbar spine that was potentially unstable, and determined that Plaintiff should be admitted to the hospital (Tr. 271). Dr. Timothy Schremmer, a physician in the emergency department at St. Joseph's Hospital, discussed Dr. Berlet's findings with Plaintiff, including that the burst fracture could lead to paralysis due to a bone fragment lacerating the spinal cord and that the burst fracture was not amenable to a simple "vertebral plasty type procedure," and suggested that Plaintiff be admitted (Tr. 272). At that time, Plaintiff indicated that he did not want anyone but Dr. Inga to perform surgery on him and did not wish to stay in the hospital or be transported to a different hospital where Dr. Inga had privileges, so he was discharged without further care (Tr. 272-73).

Following the initial diagnosis in October 2015, Plaintiff continued treatment with Dr. Inga through February 2018 (Tr. 330-400). Throughout the course of treatment, Dr. Inga consistently opined that, given the spinal fracture, Plaintiff was unable to return to work or

engage in any kind of gainful employment for a period of several months to more than a year (Tr. 276-77, 282, 330-31, 332, 340-44, 346, 383, 384, 392-93, 400).  Upon examination and review of CAT scans, Dr. Inga noted that the spinal fracture appeared to become more stable and to be healing well and that Plaintiff experienced partial healing of the vertebral body of L-1, spinous process, and pedicles on one side with some fragments still appearing on the left side of the vertebral body but, eventually, no further healing or evidence of progression appeared and the fracture remained (Tr. 276-77, 330, 346, 353, 359, 363, 369, 376, 383, 400). Neurological examination by Dr. Inga consistently revealed good strength and lack of sensory deficits in the lower extremities and, on occasion, the upper extremities (Tr. 276, 330, 346, 353-54, 359, 363, 368, 376, 383).  In November 2016, Dr. Inga indicated that Plaintiff should begin a program of physical therapy to strengthen his lower extremities and trunk (Tr. 369).  As of February 2017, Plaintiff reported that he had been going to physical therapy with some strengthening of his trunk and lower extremities, but, at the same time, Dr. Inga noted that X-rays demonstrated that the fracture remained unchanged (Tr. 363-64).  Indeed, Dr. Inga later reiterated in February 2018 that the improvement in Plaintiff's fracture ceased as of February 2017 (Tr. 400).

Given the objective evidence of record and based on Dr. Inga's continuous treatment of Plaintiff, Dr. Inga opined in October 2015 that Plaintiff remained unable to sit or stand for more than a few minutes at a time and required bed rest at all times due to the spinal fracture (Tr. 282).  In January 2018, Dr. Inga echoed that opinion, indicating that Plaintiff could not continuously sit or stand for any length of time, could sit less than two hours total in an eight-hour workday, would need to elevate his legs 80 percent of an eight-hour workday, could not bend or twist, would be absent from work more than three times per month due to his spinal fracture, would experience interference with his attention and concentration more than 20

percent of the time, and, most notably, could not take an upright position (Tr. 340-44). Accordingly, even with the noted incremental improvements and positive neurological findings, Dr. Inga concluded that neither his examinations nor the diagnostic imaging indicated that Plaintiff maintained the ability to perform work activities.

Despite that, and notwithstanding that Dr. Inga is the only treating source of record, the ALJ concluded that Dr. Inga's opinion was entitled to little weight and that Plaintiff maintained the ability to perform a reduced range of sedentary work. Significantly, Social Security Ruling ("SSR") 83-10 describes "sedentary work" as follows:

> 1. *Sedentary work.* The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

1983 WL 31251, at *5 (Jan. 1, 1983) (emphasis in original). Though the ALJ acknowledged that Plaintiff required the use of an assistive device and limited Plaintiff to work not requiring climbing ladders, ropes, or scaffolds, the ALJ determined that Plaintiff could perform up to occasional climbing of ramps and stairs, crawling, crouching, kneeling, and stooping with no more than frequent balancing (Tr. 21). Nothing in the record supports those limitations, especially given the fact that the spinal fracture never fully healed. Though, as the ALJ recognized, Dr. Inga's treatment notes and opinions indicate that Plaintiff experienced some improvement, they also consistently indicate that Plaintiff could not maintain an upright

10

position, Plaintiff could not sit or stand for any length of time, and Plaintiff's spinal fracture, while slightly improved, remained very much present. The record therefore contradicts the ALJ's finding that Dr. Inga's opinions were not consistent with the medical evidence of record as a whole, particularly his treatment notes (Tr. 22). Indeed, "[i]t is not enough merely to point to positive or neutral observations that create, at most, a trivial and indirect tension with the treating physician's opinion by proving no more than that the claimant's impairments are not all-encompassing." *Schink*, 935 F.3d at 1263. That appears to be exactly what the ALJ did in this instance. Primarily, the ALJ fails to connect the fact that Plaintiff developed minimal strengthening of the trunk and maintained good strength and no sensory deficits in his lower extremities to the conclusion that Plaintiff's fractured spine allowed him to perform a reduced range of sedentary work activities, including occasional climbing of ramps and stairs, crawling, crouching, kneeling, and stooping, where Dr. Inga repeatedly concluded that Plaintiff could not bend or twist at all nor sit or stand for any length of time, beyond perhaps a few minutes, due to the inability to take an upright position (Tr. 282, 340-43). Nothing in the evidence of record contradicts Dr. Inga's opinions, and his opinions remained consistent throughout and find support in the record. The ALJ therefore failed to apply the proper legal standards in considering Dr. Inga's opinions, and the decision thus is not supported by substantial evidence.

B.  **SSR 82-59**

Plaintiff's argument that the ALJ incorrectly considered Plaintiff's rejection of Dr. Inga's recommendation to use surgery to treat Plaintiff's burst fracture likewise warrants remand. Plaintiff points to SSR 82-59[3] for the proposition that, where an individual decides to

---

[3] SSR 18-3p rescinded and replaced SSR 82-59 for determinations and decisions made on or after October 29, 2018. *See* SSR 18-3p, 2018 WL 4945641, at *1 & n.1 (Oct. 2, 2018). In SSR 18-3p, the SSA indicated that, when a federal court reviews a final decision in a claim, the court should review the final decision using the rules that were in effect at the time the SSA issued the decision under review. *Id.* at n.1. If the court finds reversible error and remands the case

follow treatment recommended by one treating source, to the exclusion of alternative treatment recommended by one or more other treating sources, the issue of failure does not arise. *See* 1982 WL 31384, at *4. Though such proposition is not relevant to the matter at hand, as Dr. Inga constituted the only treating source advising Plaintiff on treatment options, SSR 82-59 is still instructive and pertinent to the analysis. Under SSR 82-59, the SSA may make a determination that an individual failed to follow prescribed treatment only where all of the following conditions exist: (1) the evidence establishes the individual's impairment precludes engaging in substantial gainful activity ("SGA"); (2) the impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; (3) treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and (4) the evidence of record discloses that there has been a refusal by the individual to follow the prescribed treatment. 1982 WL 31384, at *1. Regarding the development of the issue of the failure to follow prescribed treatment, SSR 82-59 dictates, in relevant part:

> Development of Failure to Follow Prescribed Treatment
>
> Where the treating source has prescribed treatment clearly expected to restore ability to engage in any SGA (or gainful activity, as appropriate), but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed.
>
> *Development With the Claimant or Beneficiary*--The claimant or beneficiary should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.
>
> The record must reflect as clearly and accurately as possible the claimant's or beneficiary's reason(s) for failing to follow the prescribed treatment.

---

for further administrative proceedings on or after October 29, 2018, SSR 18-3p will apply to the entire period at issue in the decision made on remand to the SSA. *Id.* Here, the ALJ rendered his decision on May 2, 2018, so SSR 82-59 applies to review of the ALJ's decision (Tr. 25). Upon remand, however, the ALJ will apply SSR 18-3p.

> Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed. The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits. Particular care should be taken to avoid any impression that SSA is attempting to influence the individual's decision. No statements should be made which could be construed in any way as interference with the doctor-patient relationship.
>
> *Development With Treatment Source*--After documenting the claimant's or beneficiary's statements concerning the refusal of treatment, it may be necessary to recontact the treating source to substantiate or clarify what the individual was told. If possible such contacts should be made by the DDS staff physician.
>
> The nature of the information requested from the treating source will vary according to the circumstances of the case. For instance, where the claimant or beneficiary alleges that a physician has advised that the chances of obtaining good surgical results are poor, ask the treating physician what the individual was told about the prognosis with and without treatment and elicit information regarding the individual's reaction to accepting such treatment.
>
> Where the claimant fears undergoing prescribed surgery, the treating physician should be informed of this fact and asked about his or her current recommendation(s) for treatment. If the treating source decides against surgery, there is no issue of "failure" unless the patient refused to cooperate in an alternative recommended course of treatment, which was expected to restore the individual's ability to work.

*Id.* at \*2-3.

SSR 82-59 goes on to identify several instances where an individual's failure to follow prescribed treatment would be generally accepted as "justifiable" and thus such "failure" would not preclude a finding of disability. *Id.* at \*3-4. Two examples appear applicable to Plaintiff. First, the failure to follow prescribed treatment may be "justifiable" where the treatment carries a high degree of risk because of the enormity or unusual nature of the procedure. *Id.* at \*4. Spinal fusion surgery to correct a burst fracture, which contains bone fragments that could potentially lead to paralysis due to a bone fragment lacerating the spinal cord, would seem to

13

fall within this category.  Second, the failure to follow prescribed treatment may be "justifiable" where the claimant's fear of surgery may be so intense and unrelenting that it is effectively a contraindication to surgery.  *Id.* at *3.  SSR 82-59 instructs that, where "*a treating source who advised surgery later decides that the individual's fear is so great that the individual is not a satisfactory candidate for surgery, there is no issue of 'failure.'*"  *Id.* (emphasis in original).

        Here, in February 2018, Dr. Inga completed a questionnaire regarding Plaintiff's ability to perform work, any improvement experienced by Plaintiff since the fracture of his lumbar spine in October 2015, and whether surgery would produce a beneficial result, including an expectation that Plaintiff could return to work activity (Tr. 400).  Dr. Inga reported that Plaintiff was unable to engage in any form of work at that time, including sedentary work, and that Plaintiff's improvement following the burst fracture ceased as of February 2017 (Tr. 400).  Dr. Inga stated that Plaintiff should remain non-weight bearing because of the unstable burst fracture at the L-1 spine (Tr. 400).  According to Dr. Inga, the lumbar surgery proposed to Plaintiff was "clearly expected to return [Plaintiff] to work activity, even if it [was] only light or sedentary" (Tr. 400).  Notwithstanding, Dr. Inga indicated that Plaintiff did not willfully fail to follow his advice regarding surgery but rather that the delay in undergoing surgery produced a beneficial result, namely improvement in his condition through February 2017 (Tr. 400).  Dr. Inga further elaborated that the reason that Plaintiff should not undergo surgery immediately was due to Plaintiff's fear of surgery, especially the instrumentation (Tr. 400).  Indeed, throughout the record, Dr. Inga reported that Plaintiff expressed a fear of surgery, had not been agreeable with surgery, had refused surgery, was adamant not to undergo surgery, did not consent to surgery because he believed he would either lose a job or not be hired, declined surgery, was reluctant to undergo surgery, and indicated a desire to remain in conservative treatment (Tr. 282, 330-32, 343, 346, 354, 363-64, 369, 376, 383, 384, 392-93, 400).  Dr. Inga

also indicated on several occasions that, given the strong evidence of healing and that the fracture appeared to be healing well without any evidence of complications, continuation of the same management appeared to be appropriate (Tr. 277, 332, 383).

During the hearing, Plaintiff indicated that he did not "have a fear of surgery" (Tr. 64). Instead, according to Plaintiff, Dr. Inga told him from the initial discussion that if Plaintiff underwent surgery, he would not maintain the ability to perform the type of work he previously performed (Tr. 64). Plaintiff stated that Dr. Inga informed him that he could heal naturally with use of a bone growth stimulator and bed rest (Tr. 64). Plaintiff understood that the natural healing would take approximately a year or two before he could go back to work but that Dr. Inga informed him more recently that it could take up to three to five years to heal naturally (Tr. 64-65). During the course of his treatment with Dr. Inga, Plaintiff indicated that Dr. Inga informed Plaintiff that Plaintiff was making progress, his bones were healing, and to disregard the reports from the radiologists since they just look at images (Tr. 65). Plaintiff stated that Dr. Inga told him that, as long as Plaintiff kept getting a CAT scan on a regular basis, Dr. Inga would let him heal naturally (Tr. 65). Notably, Plaintiff indicated that the first time Dr. Inga informed Plaintiff that he would need surgery was after he retained a lawyer, and, as a result, Plaintiff planned to get a second opinion regarding the need for surgery (Tr. 65).[4] To the extent that the other doctor determined that Plaintiff needed surgery, Plaintiff would have Dr. Inga perform the surgery, but to the extent surgery was not required, Plaintiff wanted to begin working again (Tr. 65). To the extent necessary, Plaintiff preferred Dr. Inga perform the surgery because Dr. Inga is a neurosurgeon rather than an orthopedic surgeon, and Dr. Inga successfully performed a prior surgery on Plaintiff that left Plaintiff with zero pain afterward, so Plaintiff

---

[4] Dr. Inga's treatment notes indicate that he discussed Plaintiff obtaining a second opinion in June and October 2017 (Tr. 354, 359).

15

believed that Dr. Inga would ensure that Plaintiff would not be in pain for the rest of his life (Tr. 66).

Plaintiff went on, stating that Dr. Inga informed him in October 2017 that he should get a second opinion about whether he could walk (Tr. 66). At that time, Plaintiff believed he was still healing, which Dr. Inga confirmed but then also told Plaintiff that it was unclear how long the healing would take and that Plaintiff was still a surgery candidate (Tr. 66). Plaintiff felt that he had waited for a long time trying to heal, and Dr. Inga kept informing him that he was in fact healing, so if an orthopedic doctor said that his bones were strong enough to hold his body weight, he wanted to start physical therapy and start walking (Tr. 67). When asked as to why he would not undergo surgery if Dr. Inga told him he needed it, Plaintiff indicated that Dr. Inga informed him that the natural healing would result in zero disability with no implementation (Tr. 67). In contrast, Plaintiff understood Dr. Inga to say that, if Plaintiff underwent surgery, he would remain partially disabled for the rest of his life (Tr. 67). As bone fusion could not be undone, Plaintiff believed that those were his options, but he specifically did not understand Dr. Inga telling him that healing naturally was no longer an option (Tr. 67). Indeed, Plaintiff stated that Dr. Inga's repeated statements that Plaintiff continued healing provided the basis for Plaintiff's continued appointments and CAT scans (Tr. 67). At the time Dr. Inga advised Plaintiff to obtain a second opinion about walking in October 2017, Plaintiff believed that he was being sent to a doctor who would tell him to undergo surgery (Tr. 67-68). Plaintiff then requested the name of a doctor "that's not going to be cut-happy" with the intent that, if the doctor examined him and determined that Plaintiff did not need surgery, he could go back to Dr. Inga and start physical therapy (Tr. 68).

At best, the record reflects that Plaintiff maintained two justifiable reasons for the failure to undergo the proposed spinal fusion surgery: (1) fear of the surgery and (2) the surgery

carrying a high degree of risk because of the enormity or unusual nature of the procedure. At worst, the record reflects confusion and a lack of clarity as to the discussions between Dr. Inga and Plaintiff regarding the efficacy and effects of the surgery that formed the basis of Plaintiff's failure to undergo the surgery. Furthermore, under SSR 82-59, to the extent that the ALJ intends to consider Plaintiff's failure to undergo surgery as lacking a justifiable or good reason, the ALJ must inform Plaintiff of that fact and its effect on his eligibility for benefits before a determination is made. 1982 WL 31384, at *5. Plaintiff would then be afforded an opportunity to undergo the treatment or show justifiable cause for failing to do so. *Id.* Pursuant to SSR 82-59, it "is very important that the individual fully understand the effects of failure to follow prescribed treatment" as an adverse determination on that basis will mean that the claimant will not later be able to meet the requirements for entitlement even if the claimant undergoes or proposes to undergo the prescribed treatment. *Id.* Accordingly, upon remand, if the ALJ intends to consider Plaintiff's failure to follow Dr. Inga's recommendation for spinal fusion surgery, the ALJ should conduct the appropriate inquiry and set forth the proper findings regarding Plaintiff's failure to follow prescribed treatment.

**IV.**

Accordingly, after consideration, it is hereby

ORDERED:

1. The decision of the Commissioner is REVERSED and the matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further administrative proceedings consistent with this Order.

2. The Clerk is directed to enter final judgment in favor of Plaintiff and close the case.

DONE AND ORDERED in Tampa, Florida, on this 21st day of September, 2020.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

cc: Counsel of Record